IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BRENT JACOBY (#291560)       *
    Plaintiff,          *
                       *
vs.                  *     CIVIL ACTION:13-00070-KD-B
                       *
SHERIFF HUEY MACK, *et al.*  *
    Defendants.        *

ORDER

Plaintiff, an Alabama prison inmate proceeding *pro se* and *in forma pauperis* filed a complaint seeking relief under 42 U.S.C. § 1983.  This action is now before the court on Defendants' Motions for Summary Judgment. (Docs. 55, 68, 69, 70).  After careful consideration of the motions, and the documents filed in support of and in opposition to the motions, and for the reasons stated below, Defendants' Motions for Summary Judgment are **granted** and Plaintiff's action is **dismissed with prejudice.**

I.    BACKGROUND

As a preliminary matter, the undersigned observes that Plaintiff Jacoby is a frequent litigator. He filed four complaints, including the instant one, while incarcerated as a pretrial detainee at the Baldwin County Jail[1]. See Jacoby v.

---

[1] A PACER ("Public Access to the Court Electronic Record") search reveals that in addition to the complaints that he has filed in this district, Jacoby has also filed at least seven other § 1983 actions. See Jacoby v. Conway, CA 10-00920-HBS(W.D.N.Y June 2, 2011), Jacoby v. County of Oneida, New York, 05-1254 2009 U.S. Dist. LEXIS 83235

Baldwin County Jail, Civ. No. 12-00197-WS-M (hereinafter referenced as "Jacoby I"), 2013 WL 2285108, 2013 U.S. Dist. LEXIS 72212 (S.D. Ala. May 7, 2013), Jacoby v. Mack, Civ. No. 12-00366-CG-C, 2014 WL 2435655, 2014 U.S. Dist. LEXIS 74768 (S.D. Ala. Mar. 14, 2014) (hereinafter referenced as "Jacoby II"), Jacoby v. Baldwin County, Civ. No. 12-00640-CG-N, 2014 WL 2641834, 2014 U.S. Dist. LEXIS 81477 (S.D. Ala. Mar. 18, 2014) (hereinafter referenced as "Jacoby III"). Some of the claims that Jacoby seeks to raise in this action have already been considered and rejected in the earlier filed actions[2]. In fact, all of Jacoby's claims in each of those actions were dismissed after it was determined that there were no genuine issues of material fact in dispute, and that the defendants were entitled to judgment as a matter of law. Id.

From its review of the record, the Court summarizes the material factual allegations in this case in the light most

---

(N.D.N.Y. Sept.11, 2009),Jacoby v. Moscicki, 07-00342-HBS, 2008 U.S. Dist. LEXIS 124827 (W.D.N.Y. Sept. 12, 2008), Jacoby v. Phelix, 07-00872-(DNH/ATB) 2010 U.S. Dist. LEXIS 44222 (N.D.N.Y Mar. 31, 2010), Jacoby v. Sears, CA 07-00872-ATB (N.D.N.Y. Mar. 28, 2011), Jacoby v. Buncombe County Drug Treatment Program, 09-304-03-MU, 2009 U.S. Dist. LEXIS 80419 (W.D.N.C. Aug. 13, 2009), and Jacoby v. Fischer, 10-00920-HBS (W.D.N.Y. Apr. 10, 2013).

[2] The Court takes judicial notice of its records. See United States v. Glover, 179 F.3d 1300, 1302 n.5 (11th Cir. 1999) ("A court may take judicial notice of its own records and the records of inferior courts.").

favorable to Jacoby.[3] At all times relevant to his complaint in this action, Jacoby was incarcerated at the Baldwin County Correctional Facility as a pre-trial detainee. (Doc. 1 at 12). Jacoby arrived at the facility in October 2011, and was transferred from the facility, and into the custody of the Alabama Department of Corrections upon his convictions for Third Degree Burglary in October 2013. (Jacoby I, Doc. 98 at 2);(Doc. 39 at 4); www.doc.state.us/inmateHistoryaspxary (last visited on March 14, 2016.).

On January 6, 2013, prison officials received a tip that there was tobacco in the block occupied by Jacoby and other inmates. (Doc. 32-3 at 3-4). This prompted a block search by staff. (Id.). During the search, tobacco was found taped to a string and hanging down a doorframe, concealed from view. (Id.) This tobacco was accessible to Jacoby and other inmates. (Id.). Sgt. Lovett ordered all inmates who could be implicated in this incident, including Jacoby, to be taken to administrative segregation while the investigation was completed. (Id.). The

---

[3] For summary judgment purposes, the Court's analysis must begin with a description of the facts in the light most favorable to Jacoby, who is the non-moving party. See Skritch v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002). "[T]he 'facts' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." Priester v. City of Rivera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

general policy of the facility mandates that any inmate who might be implicated in an offense is to be placed in administrative segregation for the safety and security of the facility during an ongoing investigation. (Id.).

The following day, January 7, 2013, Sgt. Lovett was informed that Jacoby was being disruptive in his cell in administrative segregation by repeatedly kicking the cell door, and was refusing to follow instructions to stop. (Docs. 32-3 at 4; Doc. 32-7 at 10). At the time, Jacoby had been at the facility for nearly a year and a half, and during this period, he had been found with contraband on multiple occasions, he had numerous confrontations with prison staff, and he had attempted to harm himself with a razor on at least two occasions. (Jacoby I, Doc. 64 at 3-5; Jacoby II, Doc. 71 at 2-3, Jacoby III, Doc. 74 at 35). Fully aware of Jacoby's disruptive history, Sgt. Lovett sent officers to Jacoby's cell and instructed the Corporal on the shift to use pepper spray if Jacoby continued to be combative and refused to follow instructions. (Doc. 32-3 at 4).

A video of the incident shows a gathering of five or six officers walking and discussing "handling business". (Doc. 32-8.) As officers approach and unlock the cell door, several

inmates can be seen exiting the cell, and one inmate is seen couched on his knees on the floor.  Officers yell for the inmate to get down, and then two officers move in, with one quickly spraying the inmate, who is identified as Jacoby, in the direction of the back of his head.  Jacoby is taken to the floor and the officers place Jacoby's hands behind his back, and handcuff him. (Id.).  Jacoby is then placed on his feet, and officers proceed to escort him down a hallway.  They reach a closet sink, bend him over, and rinse his face and the back of his head with water.  Jacoby, who is clad is short pants, is then placed in a restraint chair. At points during the encounter, Jacoby is yelling about the use of spray and threatening to sue the officers involved. The entire video lasts approximately six minutes.(Id.)

On January 27, 2013, a routine search for contraband was performed. (Doc. 32-3 at 5; Doc. 32-7). A 1.5 pound block of crushed soap was found in Jacoby's possession in violation of contraband policy. (Doc. 32-3 at 5; Doc. 32-6; Doc. 32-7). The soap was confiscated and Jacoby was charged with violating the prison's weapon's policy because the crushed soap could easily be used as a weapon, to hide other contraband such as razors, and to attempt to vandalize property. (Id.). On February 4,

2013, a disciplinary hearing was conducted, Jacoby was found guilty, and he was confined to segregation for thirty days. (Doc. 1 at 10; Doc. 38-1).

In the instant petition, which was filed on February 14, 2014[4], Jacoby asserts claims against Baldwin County Sheriff Huey "Hoss" Mack, Captain Jimmie Bennett, Sgt. Janie Lovett, Cpl. ReNisha Spencer, Officer McCants and Cpl. Winky for the incidents described above. Jacoby complains that he was subjected to inhumane conditions in segregation because segregation is overcrowded such that three inmates were forced to sleep in cells designed for one to two persons, and he was "forced to sleep with urine splattering on him, on his sheets with pubic hairs, body hairs, and dirt all over him for 3 days because he was forced to sleep on the floor". (Doc. 1 at 5).

Jacoby also contends he was "denied outside recreation for 3 days, periodicals to read, and the opportunity to purchase hygiene products" while in segregation due to BCSCC's policy "to not allow inmates to go to recreation, having reading materials, and purchase grooming products in segregation." (Id.). He

---

[4] Under the mailbox rule, absent contrary evidence, a prisoner's complaint is deemed filed on the date it is delivered to prison officials for mailing. See Houston v. Lack, 487 U.S. 266, 271-72, 108 S. Ct. 2379, 101 L. Ed. 2d 245 (1988); Adams v. United States, 173 F.3d 1399, 1340-41 (11th Cir. 1999); Washington v. United States, 243 F.3d 1299, 1301 (11th Cir. 2001); see also (Doc. 1 at 7).

further avers that he was placed in segregation due to the contraband of another inmate, and that he is a "serious to severe mentally ill inmate and should not be housed under these extreme conditions." (Doc. 1 at 6). Jacoby also contends that during the January 7, 2013 incident, he was sprayed with pepper spray for no reason while he laid on the ground without a shirt, shoes, or socks, and that he was placed in a restraint chair and left for "8 ½ hours strapped down screaming in agony for water and out of pain" which also caused him to "urinate [] on himself because he was not allowed to go to the bathroom." (Doc. 1 at 6-8). He further claims that he was denied due process because he was not provided adequate notice of the February 4 disciplinary hearing, and the hearing was not recorded. (Doc. 1 at 10; Doc. 38-1).

According to Jacoby, each of these incidents reflects the policy and customs of Defendants Sheriff Mack and Captain Bennett in supervising the BCSCC facility. (Doc. 1 at 9). Additionally, Jacoby claims that Sgt. Lovett is retaliating against him due to his continued filing of grievances and lawsuits. (Doc. 1 at 9). Jacoby requested, and was granted permission to file an amended complaint on December 5, 2014 in order to name Defendants McCants and Winky, who had been

previously identified in the complaint as John Doe #1 and John Doe #2. (Docs 45, 49).

Defendants Spencer, Bennett, Mack, and Lovett filed an Answer and Special Report disputing Jacoby's claims. (Docs. 32, 33). Defendants contend that Jacoby's claims are barred by the doctrines of collateral estoppel and res judicata, as well as by the Prison Litigation Reform Act because he has not suffered a physical injury as a result of the allegations in his amended complaint. They also argue that any claims against Defendants in their official capacity should fail due to Eleventh Amendment immunity, and that claims brought against them in their individual capacities should also fail because Jacoby cannot show a violation of a clearly established right.[5] (Doc. 32 at 13-24). According to Defendants, Jacoby's claims of excessive force, inadequate conditions of confinement, due process violation, retaliation, and policy and procedure claims fail on their merits[6]. (Id. at 24-37).

---

[5] Defendants also asserted that Jacoby is barred from bringing this lawsuit because he failed to disclose prior lawsuits that showed that he had incurred three strikes prior to filing this claim. (Doc. 32 at 10). This argument was considered, and ultimately rejected by the court. (Doc. 49).

[6] On February 10, 2015, Defendants filed a Notice of Relevant Precedent (Doc. 40) advising the Court of an opinion by the Eleventh Circuit affirming the dismissal of Jacoby's claims in "Jacoby I",

The Court entered an order notifying the parties that Defendants Spencer, Bennett, Mack, and Lovett's Answer and Special Report were being converted into a motion or summary judgment, and giving the parties an opportunity to file briefs in support or opposition. (Doc. 56).  However, before the conversion order was entered, Jacoby filed a response in opposition to Defendants' summary judgment motion. (Doc. 39).  The two later added Defendants, Winky and McCants, filed their Special Report and Answer on February 8, 2016. (Docs. 68, 69).  The Court entered an order notifying the parties that Winky and McCants' Answer and Special Report were being converted into a motion or summary judgment, and giving them an opportunity to file briefs in support or opposition. (Doc. 70).

The motions are now ripe for consideration[7].

## II.  STANDARD OF REVIEW

---

Jacoby v. Baldwin County Jail, Civ. No. 12-197-WS-M, 2013 WL 2285108, 2013 U.S. Dist. LEXIS 72212 (S.D. Ala. May 7, 2013).

[7]  More than two weeks after the deadline for filing opposition briefs, Jacoby, on March 14, 2016, filed a motion for an extension of time contending that he had been raped and kidnapped; thus, was unable to timely file his response. (Doc. 74).  However, the undersigned finds that Jacoby's request is due to be **denied.**  The docket reflects that mere days earlier, on March 9, 2016, Jacoby filed a document informing the Court that he wanted to proceed with this case, that he was not going anywhere, and that he wanted his day in court.  At that point, Jacoby did not indicate a desire to file a response, request an extension of time to file to file a response, or apprise the Court of any problems encountered in filing a response.  In view of such, Jacoby's extension request is **denied.**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'"(emphasis in original)).

> The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-24.
>
> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. To avoid summary judgment, the nonmoving party "must

10

> do more than show that there is some metaphysical
> doubt as to the material facts." Matsushita Elec.
> Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586,
> 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  On the
> other hand, the evidence of the nonmovant must be
> believed and all justifiable inferences must be drawn
> in its favor. See Anderson, 477 U.S. at 255.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926
F.Supp.2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations
omitted).

As noted *supra,* the Court, in considering whether
Defendants are entitled to summary judgment in this case, views
the facts in the light most favorable to Plaintiff. Comer v.
City of Palm Bay, Florida, 265 F.3d 1186, 1192 (llth Cir. 2001)
("We view the evidence and all factual inferences raised by it
in the light most favorable to the non-moving party, and resolve
all reasonable doubts about the facts in favor of the non-moving
party.").  The requirement to view the facts in the nonmoving
party's favor extends only to "genuine" disputes over material
facts.  A genuine dispute requires more than "some metaphysical
doubt as to material facts." Garczynski v. Bradshaw, 573 F.3d
1158, 1165 (11th Cir. 2009) (internal citations omitted).  A
"mere scintilla" of evidence is insufficient; the nonmoving
party must produce substantial evidence in order to defeat a
motion for summary judgment. Id.

11

Moreover, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith, 439 F.App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).[8]

Additionally, the undersigned recognizes that while the Court is required to liberally construe a *pro se* litigant's pleadings, the Court does not have "license to serve as *de facto* counsel for a party . . . or to rewrite an otherwise deficient pleading in order to sustain an action." GJR Invs., Inc. v. Cnty. of Escambia, Fla., 132 F.3d 1359, 1369 (11th Cir. 1998) (citations omitted), overruled on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010); see also Giles v. Wal-Mart Distrib. Ctr., 359 F.App'x 91, 93 (11th Cir. 2009) (internal

---

[8] "Unpublished opinions are not considered binding precedent, but may be cited as persuasive authority." 11th Cir. R. 36-2.

citations and quotations omitted) ("Although *pro se* pleadings are held to a less strict standard than pleadings filed by lawyers and thus are construed liberally, this liberal construction does not give a court license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action.").

Based upon a liberal construction of Jacoby's complaint, the Court construes his factual allegations as asserting an excessive force claim based upon his altercation with Defendants in January 2013, a claim that the conditions of his confinement are constitutionally inadequate, claims that his due process rights were violated by the searches and disciplinary procedures he faced, claims of retaliation by prison officials, and claims that the Defendants acted with deliberate indifference in setting policies and procedures. The undersigned will discuss each of these claims in turn individually below.

## II.  DISCUSSION

### A. Qualified Immunity

#### 1. Official Capacity

It is well-established that, "suits against an official in his or her official capacity are suits against the entity the individual represents." Parker v. Williams, 862 F.2d 1471, 1476

n.4 (11th Cir. 1989), *overruled on other grounds in* Turquitt v. Jefferson County, 137 F.3d 1285, (11th Cir. 1998); see Monell v Dep't of Soc. Servs., 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)("[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."); Farred v. Hicks, 915 F.2d 1530, 1532 (11th Cir. 1990). For the purposes of qualified immunity, it is not disputed that Defendants are state officials.

Thus, to the extent that Jacoby's claims are against the Defendants in their official capacities, his claims are effectively claims against the State of Alabama. The Supreme Court has held that states and state officials are not "persons" subject to liability pursuant to 42 U.S.C. § 1983. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Further, pursuant to the Eleventh Amendment of the United States Constitution, a state's own citizens may not sue unless the state consents to suit or Congress acts to abrogate immunity. See Carr v. Florence, 916 F.2d 1521, 1524-25 (11th Cir. 1990). There is nothing before the Court that suggests that the State of Alabama has consented to the suit or that Congress has acted to abrogate immunity. Accordingly, Defendants

have absolute immunity against the claims asserted against them in their official capacities.

### 2. Individual Capacity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). A law enforcement officer is entitled to qualified immunity if "an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Id. Qualified immunity from suit is intended to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

Courts utilize a two-part framework to evaluate individual capacity qualified immunity claims. One inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if

15

true, establish a constitutional violation. Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513, 153 L. Ed. 2d 666 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001)). If the facts, construed in the light most favorable to the plaintiff, show that a constitutional right has been violated, another inquiry is whether the right violated was "clearly established." Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 150 L. Ed. 2d 272 (2001). The Eleventh Circuit has observed that in determining whether a right was "clearly established", the courts do not require a case directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011) (internal quotation marks omitted). Id., at 741, 131 S. Ct. at 2083; see also Wilson v. Blankenship, 163 F.3d 1284, 1288 (11th Cir. 1998)(internal citation omitted)(emphasis in original)("General propositions and abstractions do not qualify for bright line, clearly established law. For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what

defendant is doing violates federal law *in the circumstances*."). Both elements of the two part test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case. <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S. Ct. 808, 821, 172 L. Ed. 2d 565 (2009).

Before applying the two-part test, the initial inquiry in a qualified immunity case is whether the public official proves "that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). In this case, no one has disputed that Defendants were acting within the scope of their discretionary authority as jail officials at the time of the incidents asserted in the complaint. Thus, the inquiry before the Court is whether qualified immunity is available as a defense to Jacoby's individual capacity claims.

For the reasons detailed below, the Court finds that no genuine issue of material fact exists in support of Jacoby's claims of alleged constitutional violations, and that the Defendants are entitled to summary judgment on all claims as a matter of law.

B. Excessive Force Claim

As noted *supra,* Jacoby contends that Defendants used excessive force when he was pepper sprayed on January 6, 2013, and placed in a restraint chair for 8 and one-half hours without being properly decontaminated. The analysis of an excessive force claim brought under § 1983 begins with determining the specific constitutional right allegedly infringed by the challenged application of force. Graham v. Conner, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). The Fourteenth Amendment prohibits the use of excessive force against pretrial detainees, such as Jacoby[9]. See, e.g., Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996) ("Claims involving mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause[.]"). "In order to determine whether the amount of force used by an . . . officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." Lee, 284 F.3d at 1197; see also Graham v. Connor, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Thus, the Court evaluates pretrial detainee excessive force

---

[9] As noted, the record reflects that at the time of the January/February 2013 incidents alleged in the Jacoby's complaint, he was a pretrial detainee at the Baldwin county jail.

claims under an objective reasonableness standard. Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473-74, 192 L. Ed. 2d 416 (2015); see also Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1353 (11th Cir. 2015) (explaining that the objective reasonableness standard "asks whether the force applied is objectively reasonable in light of the facts confronting the officer, a determination we make from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight.").

In examining excessive force claims, courts should keep in mind that "[o]fficers facing disturbances 'are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" Kingsley, 135 S. Ct. at 2474 (quoting Graham, 490 U.S. at 397). Furthermore, "a court must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." Id.; Bell v. Wolfish, 441 U.S. at 547 ("Prison officials must be free to take appropriate action to insure the safety of inmates and corrections personnel."); Wilson v. Blankenship, 163 F.3d 1284, 1295 (11th Cir. 1998)("The courts will not normally "second-

guess prison officials on matters that they are better equipped to handle under the exigencies of an internal disturbance.""").

Thus, an objective determination of unreasonableness must be made from the perspective of a reasonable officer on the scene, and includes what the officer knew at the time. Id. (citing Graham, 490 U.S. at 296). This determination must account for the "legitimate interests [stemming from the government's] need to manage the facility in which the individual detained", and must defer to "policies and practices that in th[e] judgment" of jail officials are necessary to "preserve internal order and discipline and to maintain institutional security". Id. at 2468, 2471-2473 (citing Bell v. Wolfish, 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447).

The Court in Kingsley cited several factors that could be helpful in this analysis. These include the relationship between the need for force and the amount of force used, the extent of the plaintiff's injury, any effort made by the officer to limit the amount of force used, the severity of the security problem at issue, the threat reasonably perceived by the officer, and whether the plaintiff was actively resisting. Kingsley, 576 S.Ct at 2473. These factors are not meant to be exhaustive or

exclusive, only an illustration of the types of objective circumstances that could be potentially relevant. Id.

The use of chemical agents, mace, or the pepper spray has been found not to violate the Eighth Amendment when its use is reasonable and necessary to prevent riots and to subdue recalcitrant prisoners. Williams v. Benjamin, 77 F.3d 756, 762-63 (4th Cir. 1996) (finding that the spraying of mace in the face and chest of a recalcitrant prisoner while in his cell did not constitute cruel and unusual punishment because he had been throwing water and refused to remove his arm from a food service slot); Soto v. Dickey, 744 F.2d 1260, 1270-71 (7th Cir. 1984) (upholding the use of mace in a prisoner's cell because he refused to be handcuffed), *cert. denied*, 470 U.S. 1085, 105 S. Ct. 1846, 85 L. Ed. 2d 144 (1985); Clemmons v. Greggs, 509 F.2d 1338, 1340 (5th Cir. 1975) (ruling that there was no constitutional violation when mace was used during a disturbance because there was no intent to punish), *cert. denied*, 423 U.S. 946, 96 S. Ct. 360, 46 L. Ed. 2d 280 (1975); Geas v. DuBois, 868 F. Supp. 19, 24 (D. Mass. 1994) (ruling that "'the use of non-dangerous quantities of [a chemical agent] in order to prevent a perceived future danger does not' generally overstep constitutional parameters."); Blair-El v. Tinsman, 666 F. Supp.

1218, 1222 (S.D. Ill. 1987) (finding that officers acted reasonably when they sprayed a chemical spray into an inmate's cell to quell a disturbance); cf. Ort v. White, 813 F.2d 318, 324 (11th Cir. 1987) (relying on the decision in Soto v. Dickey in which chemical agents were used, to determine that the denial of water was an immediate, coercive measure, and not punishment). It is only a "violation of the Eighth Amendment [Fourteenth Amendment] for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." Soto, 744 F.2d at 1270. "A limited application of mace may be 'much more humane and effective than a flesh to flesh confrontation with an inmate.'" Williams v. Benjamin, 77 F.3d 756, 763 (quoting Soto, 744 F.2d at 1262).

In the case at hand, the evidence is undisputed that officers used pepper spray on January 7, 2013. The undersigned observes however that the events of January 7, 2013 cannot be viewed in isolation. Indeed, Defendants assert and Jacoby does not dispute that prior to this incident, he had a number of physical encounters with staff at the Baldwin County jail. Indeed, in Jacoby v. Baldwin County, 596 Fed. Appx. 757 (11th Cir. 2014), the Eleventh Circuit addressed Jacoby's claim in

Jacoby I that the district court improperly granted summary judgment on his claim that a Baldwin County jail official used excessive force against him on December 22, 2011, when officers used pepper spray to subdue him after he cut himself with a razor blade even though he was lying on his cell floor bleeding from his wounds. Jacoby also claimed that the officers failed to decontaminate him for eight hours. In affirming the district court's grant of summary judgment in favor of the officers, the court found that the officers were justified in their use of pepper spray as Jacoby had previously "threatened violence in addition to self harm," and that the officers reasonably could have believed Jacoby might use the razor in defense when the officers approached him or that he might harm himself further. Id. at 766.

Also, in Jacoby II, Jacoby asserted excessive force claims against jail officials after he was sprayed with pepper spray on April 13, 2012 and placed in a restraint chair for eight and one-half hours. In denying Jacoby's excessive force claim, the court found that just prior to the incident, Jacoby was upset, yelling, screaming, and demanding an officer's help after realizing some of his personal items had been removed from his possession for the duration of his housing in segregation, and

23

that the defendant had warned him that if he did not cease the disruption he would be put in segregation. Jacoby II, Civ. No. 12-366-CG-C, 2014 WL 2435655, 2014 U.S. Dist. LEXIS 74768 (S.D. Ala Mar. 18, 2014).  The Court concluded that "given [Jacoby's] recalcitrant behavior, the initial use of force, the OC spray, was reasonable and was used in good faith effort to maintain or restore discipline." Id. at 13.  The Court also found no constitutional violation with respect to the subsequent use of the restraint restraint chair given that Jacoby admitted that he was warned that he would be placed in the chair if he did not obey orders, and stop yelling and kicking, and aside from some burning from the spray, he suffered no injury and required no medical care. Id. at 14. Thus, the Court concluded that Jacoby's persistent hostile behavior while restrained in the chair reasonably justified Defendants not releasing him sooner or releasing him to go to the restroom. Id. at 14-17.

In the case at hand, Jacoby contends that he did not do anything to cause the officer to spray him. According to Jacoby, when the officers entered his cell, he was laying on his stomach in a defenseless position with his arms in the air.  The video produced in discovery reflects that Jacoby was actually propped on his knees and that his arms are not visable when officers

24

entered the cell and directed him to get down to the floor. (Doc. 32-8). The video also shows that after a quick shot of the pepper spray in the direction of the back of Jacoby's head, he is placed on the floor by officers, and his hands are then handcuffed behind his back.  He is brought to his feet and immediately led out of the cell to be decontaminated.  As Jacoby is lead down the hallway, he can be heard quarreling with officers about why they came into his cell and why he was sprayed.  When he is told that he refused to stop kicking the door when he was directed to do so, Jacoby does not deny repeatedly kicking the door.  Instead, he questions whether that was sufficient to warrant the officers entering his cell, and spraying him. (Id.)

The video shows that Jacoby is taken to a closet area where he lends over a sink, and an officer uses a water hose to thoroughly rinse his face and the back of his head. The officer then uses several towels to dry Jacoby's face and the back of his head.  While Jacoby might contend that the officers should have given him more time to comply with their directive to get to the floor, the undersigned will not second guess the actions of the officers in maintaining order in the facility given Jacoby's history of disruptive behavior and physical encounters

25

with the jail staff, his refusal to stop kicking the cell doors when directed to do so, and the fact that upon entering the cell, officers directed him to get down, but it does not appear that he made any effort to do so before the pepper spray was used[10]. See Gardner v. Mack, 2015 U.S. Dist. LEXIS 25395, 2015 WL 877249 (S.D. Ala. Jan. 30, 2015)("It is arguable [the defendant] may have been successful in extracting Plaintiff from his cell without the use of pepper spray, since Plaintiff appeared to be surrendering to Defendant's will, but a single burst of the chemical agent following an inmate's failure to comply with orders, combined with his escalating obtrusive behavior, is not the type of force that shocks the conscious or equates to an Eighth Amendment violation."). Under the circumstances of this case, the undersigned finds that the use of a quick squirt of pepper spray was reasonable and likely kept the situation from further escalating.

With respect to the use of the restraint chair, Jacoby contends that he was in the chair for 8 and one-half hours, that

---

[10] The undersigned notes that a "Use of Force" form was completed following the use of pepper spray, and after a review of the incident, it was determined that the use of spray was appropriate under the circumstances; however, a corporal was reprimanded because she permitted a subordinate to use the spray when she had been instructed that she was to personally handle the use of spray if necessary. (Docs. 32-3, Doc. 32-7).

he was not permitted to shower, change clothes or use the
restroom, and as a result, his eyes, back and lower body were
burning from the spray, and he urinated on himself. The video
shows that Jacoby was clothed in short pants, and that
immediately prior to being placed in the restraint chair, his
face and the back of his head were thoroughly rinsed. (Doc. 8).
The video also reflects that the restraint chair was located in
an open hallway which makes for easy monitoring, and that Jacoby
continued to be argumentative and made known to officers his
displeasure with the decision to place him in the chair. (Id.)
And, Jacoby acknowledges that he kept crying out for a shower.
(Doc. 39 at 15).

Defendants contend that the restraint chair is never used
for punishment at the jail, but is instead used to ensure the
safety and security of the facility. (Doc. 32-1). According to
Defendants, Jacoby had a history of acting out when he thought
his situation was somehow unfair, or if he wanted attention,
even if it meant harming himself or putting others at risk.
(Doc. 32-3). According to Defendants, inmates such as Jacoby are
kept in the chair until it is determined that they can control
their behavior and no longer present a threat to themselves or
others. (Doc. 32-1).

The undersigned finds that Defendants did not act unreasonable in utilizing the chair given Jacoby's history of physical confrontations with the staff, self injury and disruptive behavior.  As noted, the day before the incident, Jacoby had been placed in administrative segregation while officials investigated the tobacco that was found on his pod area.  Apparently upset because he felt he was unfairly implicated in the incident, and placed in segregation, Jacoby chose to act out by repeatedly kicking the door despite being directed to stop.  Rather than allow the situation to escalate with Jacoby, Defendants acted quickly to bring him under control by placing him in the restraint chair[11]. (Doc. 32-3). Under these circumstances, where Jacoby suffered no injury, aside from slight burning from a quick squirt of pepper spray, and required no medical care, the undersigned finds that the use of the restraint chair to preserve internal order and safety in the facility was reasonable and thus, did not rise to the excessive force.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's excessive force claim.

---

[11] There is nothing in the record that indicates that Jacoby was charged with a disciplinary offense as a result of the incident on January 7, 2013.  Instead, in utilizing the restraint chair, it appears that officials were attempting to closely monitor Jacoby and bring him under control.

### C. Conditions of Confinement

Jacoby claims that the conditions of his confinement in F-Block at the Baldwin County facility are constitutionally inadequate. In support of this claim, he describes sleeping "in a 1 or 2 man cell in the floor with 3 people in it because segregation was overcrowded" and being "forced to sleep with urine splattering on him, on his sheets with pubic hairs, body hairs, and dirt all over him for 3 days because he was forced to sleep on the floor". (Doc. 1 at 5). He further claims that he was "denied outside recreation for 3 days, periodicals to read, and the opportunity to purchase hygiene products" while in segregation due to the Baldwin County facility's policies regarding inmates in segregation. (Id.). Additionally, he claims he is a "serious to severe mentally ill inmate and should not be housed under these extreme conditions" [i.e., segregation]. (Id. at 6). The undersigned finds that Plaintiff's claims regarding the conditions of his confinement are barred by the doctrine of *res judicata* as they have been litigated and decided adversely against Jacoby in Jacoby I, Jacoby II, and Jacoby III, or they could have been litigated in those actions.

"Res judicata is a judicially crafted doctrine, created to provide finality and conserve resources." Maldonado v. United

States AG, 664 F.3d 1369, 1375 (llth Cir. 2011); Polk v. Sears Roebuck & Co., 2012 U.S. Dist. LEXIS 65050 (S.D. Ala. May 8, 2012). "The doctrine facilities the conclusive resolution of disputes by reducing the expense and vexation attending to multiple lawsuits, conserv[ing] judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent decisions." Shurick v. Boeing Co., 623 F. 3d 1114, 1116 (llth Cir. 2010).  Res judicata applies if all of the following four elements are present: "(1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privy with them, are identical in both suits; and 4) the same cause of action is involved in both cases." Maldonado, 664 F. 3d at 1375 (omitted citations).  If those elements are present, "[t]he court next determines whether the claim in the new suit was or could have been raised in the prior action; if the answer is yes, res judicata applies. . .if even one of these elements is missing, res judicata is inapplicable." In Re Piper Aircraft, 244 F. 3d 1289, 1296 (11th Cir. 2001).

As noted *supra*, this is the fourth lawsuit that Jacoby has filed against Defendant Mack and various individuals employed by the Baldwin County jail.  In Jacoby II, Jacoby alleged that

while housed in segregation, he was denied visits, television, books, space to walk and exercise, grooming and hygiene products, access to materials to write letters or legal documents, access to outside recreation and only allowed 30 minutes of indoor recreation a day, and was housed in a "2-man" segregation unit with three of four other inmates which forced him to sleep on the floor beside the toilet where urine would sometimes "splatter" on his sheets. Upon consideration, the Court in Jacoby II held that "[t]aking Plaintiff's allegations as true, there [has] not been an "extreme" deprivation of life's basic necessities evidenced nor a risk of serious harm", and that "[e]ven the less than sanitary sleeping arrangement asserted by Plaintiff does not rise to the level of being unconstitutional. Jacoby II, Civ. No. 12-00366-CG-C, 2014 WL 2435655, 2014 U.S. Dist. LEXIS 74768 (Mar. 18, 2014). See also Jacoby III 2014 WL 2541834, 2014 U.S. Dist. LEXIS 81477 (S.D. Ala. Mar. 18, 2014)(Jacoby's claim that Sheriff Mack created unconstitutional policies that unnecessarily deprived him of periodicals, stationary, postage stamps, hygiene products, and outdoor recreation while housed in the segregation unit "do not amount to the denial of a basic human need". . . "nor do they evidence a deliberate indifference to a substantial risk of

serious harm to plaintiff's health or safety."). Given that in this action, Jacoby is seeking to bring many of these same issues that were adversely decided against him in Jacoby II, and Jacoby III, the undersigned finds that res judicata bars him from relitigating those claims in this action. While Defendant Sheriff Mack is the only defendant in this action that was also named in Jacoby II, and Jacoby III, the undersigned finds that there is clear privity between the defendants with respect to Jacoby's claims regarding the conditions in segregation at the Baldwin County facility.

Further, as held by the Court in Jacoby III, "Plaintiff's claim that Defendants Bryne and Mack breached his constitutional rights by not having and not placing him in a separate facility for seriously-severely mentally ill inmates could have been raised by Plaintiff in Jacoby I; therefore, that claim is also barred." Jacoby III, Civ. No. 12-00640-CG-N, 2014 WL 2641834, 2014 U.S. Dist. LEXIS 81477 (S.D. Ala. Mar. 18, 2014). Accordingly, the undersigned finds that Defendants are entitled to summary judgment on Jacoby's claims regarding conditions at the Baldwin County facility because those claims are barred by res judicata.

### D. Due Process

Jacoby also raises due process claims based upon the search of his cell on January 27-29, 2013 and the disciplinary proceedings brought against him regarding the incident on February 4, 2013. He claims that the hearing "was never recorded for appellate purposes, the disciplinary was not notarized by a notary as the form states it should be,  there was no hearing notice date on the paperwork" and that he "never received a copy of the disciplinary charges in a timely manner". (Doc. 1 at 10). According to Jacoby, he did not receive notice of the charges until two days after the incident, and that he was written up on a "bogus weapons charge because she [Sgt. Lovett] couldn't find nothing else to write Jacoby up for". (Id.). As a result of this hearing, Jacoby was put in segregation for thirty days. (Id.).

As an initial matter, the undersigned finds that Jacoby's claim that Defendants violated his rights because they do not allow recording of the disciplinary hearings is subject to the same ruling as in Jacoby III.  In Jacoby III, the court held that Plaintiff could not prevail on that claim because the alleged inadequacies in Defendant's disciplinary hearing procedures did not give rise to a constitutionally protected liberty interest.  Jacoby III, Civ. No. 12-00640-CG-N, 2014 WL 2641834, 2014 U.S. Dist. LEXIS 81477 (S.D. Ala. Mar. 18, 2014)

33

With respect to Jacoby's other claims, the Supreme Court has specifically held that cell searches implicate neither the Fourth nor the Fourteenth Amendment, but are "matter[s] lodged in the sound discretion of the institutional officials." Block v. Rutherford, 468 U.S. 576, 590-91 (1984).  Additionally, prison disciplinary proceedings "are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply . . .In sum, there must be a mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." Wolff v. McDonnell, 418 U.S. 539, 556, 94 S. Ct. 2963, 2675, 41 L. Ed. 2d 935 (1974).  In recognition of these principles, the Court has held that a prisoner must receive notice of the charges against him prior to the hearing; he must be allowed to call witnesses and present evidence, as long as this presentation does not pose a threat to the safety and security of the institution, and there must be a written finding. Id.

In this action, it is undisputed that Jacoby received written notice of the charges against him, and was able to

prepare a full defense [12]. (Doc. 32-1). The fact that these notices were not in Jacoby's preferred form does not amount to a deprivation of due process. Moreover, the only consequence Jacoby suffered because of the disciplinary proceedings against him was transfer to disciplinary segregation with an accompanying loss of privileges.

Disciplinary segregation is not a "dramatic departure" from the ordinary conditions of confinement for an inmate, and therefore does not in and of themselves trigger specific due process procedures like those required in a criminal trial. Sandin v. Conner, 515 U.S. 472, 485 (1995), see also Rodgers v. Singletary, 142 F.3d 1252, 1253 (11th Cir. 1998)(affirming two months in administrative segregation was not a constitutionally protected liberty interest requiring the protection of due process); cf. Williams v. Fountain, 77 F.3d 372, 374 n.3 (11th Cir. 1996)(finding that twelve months of solitary confinement was an atypical hardship of an inmate and created a liberty interest entitled to due process protection). See Jacoby III, 2014 WL 2435655 at *13 (brief sentences of 24 days in segregation and 45 days in segregation do not amount to a

---

[12] The written Notice of Disciplinary form reflects that Jacoby signed the notice and made a notation that he was not provided with a copy of the form. (Doc. 32-7 at 4).

significant hardship and are not a dramatic departure from the ordinary conditions of confinement; thus no liberty interest existed that would give rise to constitutional due process protection.). Because Jacoby does not have a protectable interest, he cannot prevail on any due process claim. See, e.g., Sandin v. Conner, 515 U.S. at 485-86.

### E. Retaliation

Jacoby alleges that he was subjected to searches and disciplinary proceedings because Sgt. Lovett "was upset over Jacoby writing Grievances and Lawsuits on her and Filing for Restraining Orders." (Doc. 1 at 6). Jacoby has raised this same issue albeit with respect to other individuals at the Baldwin County facility, and the court had determined that there was no evidentiary support for claims of retaliation. Jacoby II, 2014 WL 2435655 at *19, 2014 U.S. Dist. LEXIS 74768. The same holds true with respect to the instant petition. As observed in Jacoby II, to succeed on a claim for retaliation under § 1983, a Plaintiff:

> "must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation. McDonald v. Steward, 132 F.3d 225, 231 (5th Cir. 1998). The inmate must allege more than his personal belief that he is the victim of retaliation. Johnson v. Rodriguez, 110 F.3d 299,

310 (5th Cir.) cert denied, 522 U.S. 995, 118 S. Ct. 599, 139 L. Ed. 2d 400 (1997). Mere conclusory allegations of retaliation will not be enough to withstand a proper motion for dismissal of the claim. Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995). The inmate must produce direct evidence of the motivation or, the more probable scenario, "allege a chronology of events from which retaliation may plausibly be inferred.' Id. (citation omitted)."

Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir. 1999); Jacoby II, 2014 WL 2434655 at *19, 2014 U.S. Dist. LEXIS 74768. Jacoby asserts that Sgt. Lovett ordered a "hit" on him which led to him being sprayed with pepper spray on January 7, 2013, and that she acted in order to retaliate against him for his many grievances and lawsuits. Aside from his conclusory allegations however, Jacoby has not offered any facts that suggest, let alone demonstrate, that Defendant Lovett sought to retaliate against him. In fact, he has not even identified any specific grievance or lawsuit that purportedly led Sgt. Lovett to take any type of retaliatory action. And, he has only made vague allegations of retaliation on the part of the other Defendants.

Neither incident comprising the alleged retaliation violated any of Jacoby's rights. Indeed, it seems that Jacoby's main argument is that the actions central to this petition were so unjustified that there was no other reason besides

37

retaliation to support them, but this is not evidence sufficient to prevail on this claim[13]. Therefore, this claim is without merit, and the Defendants are entitled to summary judgment with respect to this claim.

#### e.  **Policy and Procedure Claims**

Jacoby alleges that the problems discussed *supra* are evidence of a widespread problem with the policies and procedures in place at the Baldwin County jail. (Doc. 1 at 9). To the extent possible, the court will analyze these claims as allegations of supervisory liability with regard to Sheriff Mack and Captain Bennett. On this subject, the Eleventh Circuit held:

> [Supervisory] liability under section 1983 must be based on something more than a theory of *respondeat superior*. Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions and the supervising official and the alleged constitutional violation. The causal connection can be established when a history of widespread abuse puts the

---

[13] Assuming arguendo there was a genuine issue of material fact as to the retaliatory motives of the Defendants, the second step of the objective analysis followed by the Eleventh Circuit would still entitle the Defendants to summary judgment. Under this standard, once the Plaintiff has met the burden of establishing that a protected conduct was a motivating factor behind any harm, the burden shifts to the defendant to show that he would have taken the same action in the absence of the protected activity. Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008 (citations omitted). As discussed at length in this order, the actions of all Defendants in this case were those of reasonable officials, and it is reasonable to conclude that they would have taken the same actions to maintain institutional security without any allegedly improper motive.

responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.

Dolihite v. Maughon, 74 F.3d 1027, 1052 (11th Cir. 1996). As Jacoby has not established the violation of any rights, he cannot establish that Defendants acted with deliberate indifference in setting policy and procedures. See, e.g., Cagle v. Sutherland, 334 F.3d 980, 989 (11th Cir. 2003).

Moreover, in Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009), the Supreme Court stated:

> In a section 1983 suit…where masters do not answer for the torts of their servants – the term 'supervisor liability' is a misnomer. Absent vicarious liability, each Government official, his or her own title notwithstanding, is only liable for his or her own misconduct.

Id.; see also Iqbal, 556 U.S. at 693 (Souter, J. dissenting)("Lest there by any mistake in these words the majority is not narrowing the scope of supervisor liability; it is eliminating Bivens supervisory liability entirely.").

In order to establish a causal connection between the supervisor's actions and the alleged constitutional violation, a plaintiff must show either "a history of widespread abuse [that] puts the reasonable supervisor on notice of the need to correct the alleged deprivation" [which is the standard arguably altered by Iqbal] or an inference "that the subordinates would act

unlawfully and failed to stop them from doing so." Keith v. DeKalb Cnty., Georgia, 749 F.3d 1034, 1047-48 (11th Cir. 2014)(citations omitted). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." Id. (citing Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)).

Jacoby alleges generally that Defendants Mack and Bennett were "aware of the problems with spray but won't fix it" (Doc. 1 at 12), but he points to no evidence beyond his own grievances to support this allegation. Further, the Court takes judicial notice of the fact that in Jacoby's three previous lawsuits filed while housed at the Baldwin County jail, his excessive force claims were found to be without merit. Additionally, the record before this Court is devoid of any evidence suggesting that Defendants Mack or Bennett were aware of a pattern of constitutional infirmities in regard to Jacoby's condition of confinement at the facility, and there is no allegation that either Defendant was personally involved in the alleged incidents. Accordingly, Defendants are entitled to summary judgment on this claim.

**III. CONCLUSION**

For the reasons set forth above, the undersigned concludes that Defendants are entitled to summary judgment in their favor on all claims asserted against them by Jacoby. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED,** this action is **DISMISSED** with prejudice, and judgment is entered in favor of Defendants and against Plaintiff Brent Jacoby.

**DONE** and **ORDERED** this the **21st** day of **March 2016.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**